# The EXETER BANK *vs.* JOHN ROGERS and N. GILMAN.

The Exeter Bank was incorporated by an act of the legislature, in the year 1803, to continue for the term of twenty years from January 1, 1804. In 1822 an additional act of the legislature was passed, that provided that the first act should remain and continue in force for a further term of twenty years from January 1, 1824; that there should be no division of the capital stock without the consent of the legislature, and that the bank should not have in circulation at any time bills exceeding in amount the capital stock actually paid; any cashier or other officer violating these provisions to forfeit not less than $1000 nor more than $10,000. R. was appointed cashier of the bank in 1809, gave bond with sureties for the faithful discharge of the duties of the office, and continued cashier until 1830. It was held that the bond covered all the time which R. remained in office, and that the sureties were not discharged by any of the provisions in the additional act of the legislature.

DEBT upon a bond dated February 18, 1809, with a condition as follows: "The condition of the above obligation "is such that whereas the said *John Rogers* has been, by "the President and Directors of the Exeter Bank, duly "appointed cashier of said Bank—now if the said Rogers "shall faithfully discharge the duties of said office, and shall "account for, pay and deliver to, the said President and Di-"rectors when thereto by them requested, all monies or "other property belonging to said corporation, and entrusted "to him, or otherwise in his custody or keeping, then the "foregoing obligation to be void."

The cause was submitted to the decision of the court upon the following facts.

The act incorporating the President, Directors and Company of the Exeter Bank passed on the 19th December, 1803, and by the act it was provided that the corporation should continue from the first day of January then next, "until the expiration of twenty years next following."

On the 14th June, 1822, an act in addition to the act creating the corporation, was passed, by which it was pro-

vided that the first act should remain and continue to be in force for and during the term of twenty years from and after the first day of January, 1824.

This additional act contained the following provisions :

1. That the corporation should not at any one time have bills, notes or obligations in circulation beyond the amount of the capital stock actually in the bank ; and any cashier, director, or other officer, violating this provision, to forfeit from $1000 to $10,000.

2. No part of the capital stock was to be divided until the expiration of the extended time, without the consent of the legislature ; and any cashier, director, or other officer violating this provision, was to forfeit from $1000 to $10,000.

Rogers was appointed cashier of the bank on the 30th January, 1809, and continued in the office of cashier, without any new appointment, until the 18th January, 1830.

N. Gilman, the other defendant, was appointed a director of the bank on the 6th January, 1812, and continued a director until 1830.

The money in the hands of *Rogers*, for which he had not accounted, amounted, on the 8th December, 1833, with interest, to the sum of $6656 88 ; but it is not known that Rogers ever had in his hands any money for which he did not account, until after the year 1825.

The record of the appointment of Rogers to be cashier, was as follows :

*Exeter Bank, January* 30, 1809. At a meeting of the directors—*voted unanimously* that John Rogers be appointed cashier of the Exeter Bank, to enter on the duties of the office on the 20th February next.

*Bartlett*, for Gilman, contended that the surety could not be holden upon the bond beyond the time to which the existence of the corporation was originally limited ; but if he could, the changes made by the additional act would have discharged him.

6 *Taunton* 379, *Moore* vs. *Bowmaker;* 3 *B. & P.* 363, <span style="float:right;">Exeter Bank<br>*vs.*<br>Rogers et al.</span>
*Clark* vs. *Devlin;* 1 *D. & E.* 167, *Tindall* vs. *Brown;*
8 *East* 576, *Gould* vs. *Robson;* 7 *John* 332, *The People*
vs. *Jansen;* 2 *N. H. R.* 448, *Townsend* vs. *Riddle;* 10
*John.* 587, *Rathbone* vs. *Warren;* 3 *N. H. R.* 231, *Davis*
vs. *Huggins;* 4 *do.* 221, *Grafton Bank* vs. *Kent;* 5 *do.* 99,
*Grafton Bank* vs. *Woodward;* 2 *Vesey, Jun.* 540, *Rees* vs.
*Berrington;* 4 *do.* 824, *Low* vs. *The East-India Com-*
*pany;* 6 *do.* 734, *Wright* vs. *Simpson;* 18 *do.* 20, *Boultbee*
vs. *Stubbs;* 10 *John.* 180, *Walsh* vs. *Bailie;* 1 *M. & S.*
557, *M'Iver* vs. *Richardson;* 1 *Pickering* 332, *Brewer* vs.
*Knapp;* 2 *do.* 223, *B. H. Manufactory* vs. *Messenger;*
9 *Wheaton* 720, *United States* vs. *Kirkpatrick;* 3 *Mason*
446, *Locke* vs. *The Postmaster General;* 2 *Greenleaf* 42,
*The Kennebec Bank* vs. *Turner; Angell and Ames on*
*Corporations* 175; 2 *Hammond* 334, *Thompson* vs. *Young*.

*Greenleaf* for the plaintiffs. Rogers was appointed cash-
ier in 1809 for an unlimited period, and continued in office
till January, 1830. The bond recites the appointment, and
is conditioned for his fidelity in office without limit, and for
his accounting for and paying over all monies in his custody
belonging to the corporation. The obligees remain the
same—unchanged. Their existence has not been interrupt-
ed a moment, nor their identity changed.

While Rogers was in office, he received money belonging
to the corporation, for which he has not accounted. Why
shall not the plaintiffs have judgment against him and his
surety? The principal and the surety stand upon the same
ground. The construction given to the bond must be the
same against both. 4 *Taunton* 679.

The plaintiffs claim nothing of the surety which is not fair-
ly within the scope of his engagement. They have been
guilty of no laches—done no act to discharge the surety—
made no contract for further time, nor has there been any
concealment.

This bond, like other contracts, is to be construed according to the intent of the parties, who must be understood to have contemplated all the incidents to which either themselves or the subject matter were ordinarily liable. It was given to a corporation—a body liable to be terminated by its own act, and capable of a prolonged existence by an act of the legislature. With such a corporation the defendants contracted. There is no reference in the bond to the charter. The obligors might have limited their liability : but they did not. They chose to deal in general terms. A capacity to exist a longer or shorter term was one of the essential attributes of the party with whom the defendants contracted ; and they must be presumed to have been aware of that circumstance when they made the contract, and to have calculated to be bound accordingly.

In *Reed* vs. *Fullum*, 2 *Pickering* 158, the action was debt upon a bond against a surety. The condition of the bond was that the principal, then a prisoner in the jail in Boston, should not depart without the exterior bounds of the debtors' liberties until he should be lawfully discharged. When the bond was given the debtors' liberties included the whole county of Suffolk, but soon afterwards the liberties were limited to the exterior boundary of ward No. 5, and the principal went out of the exterior boundary of that ward. This was decided to be a breach of the condition of the bond. The court said the meaning of the condition was that the debtor should not depart out of the limits that should at the time be established by law.

In *Barclay* vs. *Lucas*, 1 *D. & E.* 291, note, the action was debt upon a bond. After reciting that the plaintiffs, at the recommendation of the obligors, had agreed to take P. J. into their service and employ, as a clerk in their shop and counting house, the condition was that P. J. should account for and pay to the plaintiffs all sums of money he should at any time receive in the service of the plaintiffs. After the making of the bond, the plaintiffs took another person into

partnership.  But it was decided that the obligors continued <span style="float:right">Exeter Bank<br/>*vs.*<br/>Rogers et al.</span> liable notwithstanding this circumstance.  Lord Mansfield said the bond was intended as a surety to the house, and no change of the partners could discharge the obligors.

If the condition of the bond in such a case be that the clerk shall be faithful to the obligees, and there is nothing to show an intention that the obligors shall be liable beyond this, then the taking of a new partner will be a discharge of the obligors.  3 *Wilson* 530, *Wright* vs. *Russell;* 1 *D. & E.* 287, *Barker* vs. *Parker.*

But if the intention be, that the obligors shall be bound for the fidelity of the clerk to the house, it has never been doubted that the obligors remain bound, notwithstanding a change in the members of the firm.  1 *New R.* 41, *Dame* vs. *Girdler;* 3 *East* 490, *Strange* vs. *Lee;* 12 *East* 409, *Metcalf* vs. *Bruin;* 10 *B. & C.* 122, *Pease* vs. *Hirst.*

In this case there is no limitation of time during which the obligors are to be responsible.  As long as the corporation and office remain, and the cashier remains in the office, so long have the parties bound themselves.  The question is not whether it was wise and prudent to be so bound, but whether they are so bound.  Parties are bound by their contracts, if not against law, however unwisely they may have entered into them.  And they are bound according to the terms of the contract, however severe may be the consequences.

Thus when one executes a bond as surety for the good conduct of another during a certain period, and then dies, his estate may still be liable for a default arising after his decease.  2 *Simons* 253, *Gordon* vs. *Calvert;* 4 *Russell* 581 *S. C.;* 8 *Greenleaf, Green* vs. *Young.*

So where a mill was leased for years, and the lessee covenanted to pay rent during the term, and the mill was accidentally burnt, and lessor did not rebuild—yet this lessee was holden to pay the rent.  6 *Mass. R.* 63, *Fowler* vs. *Bott.*

VOL. VII.          4

Exeter Bank
vs.
Rogers et al.

And where a lessee covenants to keep the demised premises in repair, and at the determination of the lease to surrender them in as good condition as they were in at the date of the lease—if the buildings are destroyed by fire during the term, without the default of the tenant, he will be bound to rebuild them.    16 *Mass. R.* 238, *Phillips* vs. *Stevens;* 6 *D. & E.* 650, *Bullock* vs. *Dommitt.*

And where an administrator sold land under a license, and in his capacity of administrator covenanted for title, he was held to be personally bound.    8 *Mass. R.* 162, *Sumner* vs. *Williams ;* 4 do. 108, *Caswell* vs. *Wendell.*    Other cases of hardships voluntarily assumed, and held to be binding, may be found in 2 *B. & B.* 460, *Childs* vs. *Monins ;* 5 *Mass. R.* 299, *Thatcher* vs. *Dinsmore;* 6 do. 58, *Forster* vs. *Fuller ;* 1 *Paine C. C. R.* 305, *U. S.* vs. *Tillotson ;* 1 *D. & E.* 310, *Belfour* vs. *Weston ;* 18 *Vesey* 115 ; 1 *Simons* 150, *Leeds* vs. *Chatham ; Comyns R.* 627 ; 2 *Saund.* 422, note 2 ; 3 *M. & S.* 267 ; 2 *L. Raymond* 1165.

But in this case there was no hardship.    Gilman might have been relieved at any time by an application to the directors.

The additional act in this case did not create a new corporation, but merely prolonged the existence of the old corporation.

To ascertain whether a new corporation was created or not, we must look to the terms of the act, and see what was the intention of the legislature and of the corporators.    2 *Mason* 44.

The intent of the legislature is very evident.    The act is in addition to the former act, which it declares shall remain and continue to be in force for a longer term, "during which term the said corporation shall continue," &c.    It is not a grant to individuals by name—confers no new powers—requires no new organization—no new choice of officers—no transfer of property from the old to the new cor-

poration—no new subscription for stock—no new act to be done, but a bare acceptance of the charter.

The act has nothing upon which it can operate but the corporation in its prolonged existence. It discloses no one circumstance which has ever been deemed evidence of an intention to create a new corporation. But its terms, its letter and spirit, all show an intention to prolong the existence of the old corporation.

The understanding of the corporators is equally evident. No new act was done on their part—no new organization—no new appointment of cashier—no transfer of the property from the old to the new corporation—no pause in any of their proceedings. Upon any other supposition than that of the continued and uninterrupted existence of the same corporation all the subsequent proceedings were illegal.

There was no interval when the corporation did not exist. For by the first act the corporation was to continue twenty years next following the first day of January, 1804; so that the first period did not expire till the end of January 1, 1824, at which time the new period began. But whatever may be the rules as to the computation of time, here the expressed intention of the legislature was to continue and prolong a term not yet expired.

The cashier held his office without interruption after the expiration of the first period, and was entitled to hold it unless regularly removed. He was, then, bound by his bond to exercise it faithfully. And if he was bound his sureties were bound. For sureties are bound as long as the principal, unless the creditor has done some act to discharge them. *Theobold—Principal and Surety*, 69; 11 *Wheaton*, 184; 1 *Wheaton*, 85 and 91.

If the mere prolonged existence of the corporation vacates the bond, it must be on the ground that it was a change in the corporation. But if such a change vacates the bond, what change would not have that effect? If the capital stock were increased—if the bank had been removed from

one village to another, or the number of directors diminished, would these changes vacate a bond? Would an increase of the capital of a merchant vacate the bond of his clerk? Would the addition of new towns to a county discharge the bondsmen of the sheriff? Surely not. All these changes are to the office what Sir Matthew Hale says "new appendications" are to the law, which "do not so much constitute "a new law as amend the old, so that it still morally continues "the same law."

Whatever changes there may have been in its members or circumstances, the corporation remained the same; and it was with the corporation that the defendants contracted; and the principal is not to be discharged, nor the surety, while the principal is permitted to remain in office. 12 *Wheaton* 505, 509 and 518; 5 *Conn. R.* 151; 2 *Campbell* 413.

Here is no attempt to create a new contract by extending the terms of the bond beyond any time originally stipulated. For no particular period was limited by the parties, either expressly or by any necessary implication. It was a contract to be responsible for the fidelity of Rogers while he should continue cashier to that bank.

The case of *Hughes* vs. *Smith, 5 John.* 168, was debt upon a bond given by an under-sheriff. In New-York the sheriff is appointed annually. Hughes being sheriff appointed Smith under-sheriff, and Smith gave the bond, with condition to execute the office during his continuance therein, according to law. Hughes was re-appointed sheriff, and Smith continued to act as under-sheriff after the first year; and the question was whether the bond covered the acts of Smith after the first year. Kent, C. J. delivered the opinion of the court, that the bond covered the acts of Smith so long as the plaintiff was sheriff and Smith continued under-sheriff. It was not necessary to have the bond renewed upon the renewal of the plaintiff's commission. The bond was that Smith should execute well the office of under-sheriff

during his continuance in such office; and he was equally in that office after as before the re-appointment of the plaintiff. There was no interval between the one appointment and the other, in which the plaintiff was not sheriff; and it was not necessary to re-appoint Smith in order to constitute him under-sheriff. He had no concern with the renewal of the plaintiff's commission, so long as there was an unbroken continuation of the plaintiff's authority.

The language of the condition of the bond in these cases is to have its full effect where there is nothing to restrain it. 3 *M. & S.* 502, *Curling* vs. *Chalklen;* 12 *East* 399.

In some cases the liability of the obligors has been limited to a particular period, in express terms. 2 *Greenleaf* 42; 1 *Pickering* 332; 9 *Wheaton* 720.

In other cases it has been limited by recitals in the condition. 6 *East* 507; 2 *Saunders* 411.

In other cases it has been limited by the nature of the office. 5 *B. & P.* 175; 8 *Mass. R.* 275; 2 *M. & S.* 363.

In this case the period for which the obligors are to be bound is not limited by the words of the condition, by the nature of the office, nor by any recital; nor is there any reference in the condition, either directly or indirectly, to the time when the charter was to expire.

*Gilman,* the surety, in this case is not discharged by the extension of the charter. Mere forbearance will not have that effect. There must be a contract between the principal and the bank—a new agreement which ties the hand of the bank. *Holt's N. P. C.* 84, *Orme* vs. *Young;* 3 *Mason* 454; *Theobold,* 127, 135, 136; 1 *Mad. Chan.* 234; 2 *Vesey* 540.

But here has been no such agreement.

A mere agreement to enlarge the time of payment, if made without consideration, does not discharge a surety. 5 *Wendell* 501; 2 *Hall's S. C.* 185; 1 *Turner & Russell* 395.

There must be either a valid and binding contract for fur-

ther time, or an arrangement which operates as a fraud on the surety, or a fraudulent concealment of the delinquency of the principal to the detriment of the surety. 2 *Paige* 497.

The cases cited by counsel on the other side, are cases of new special contracts for further time between the principal and the creditor.

There has been in this case no such change of parties as to vary the contract. The plaintiffs are identically the same. The cases cited on the other side are cases of actual and substantial change of parties, where the identity was destroyed. This was the case in *Barker* vs. *Parker*, 1 *D. & E.* 287, *Dame* vs. *Girdler ;* 4 *B. & P.* 34, *Wright* vs. *Russell ;* 3 *Wilson* 530, *Weston* vs. *Barton ;* 4 *Taunton* 673 ; 3 *East* 484.

In the case of the *Bank of Washington* vs. *Barrington,* 2 *Penn. R.* 27, the bank was chartered in 1813, to continue till April 1, 1825, on condition of paying the bank tax punctually. In January, 1818, the charter was declared to be forfeited for a breach of the condition ; but on the 2d February, 1818, a new act of the legislature revived the charter, as if no forfeiture had happened. The bond of the cashier, given in 1814, was held not to extend to acts done after the forfeiture in 1818.

The new act revived the rights of the corporation, but it did not appoint new officers. The remedy on the bond was once gone, and therefore gone forever. It could not be revived by the legislature.

In the case of the *Union Bank of Maryland* vs. *Ridgely,* 1 *Harris & Gill's Rep.* 399, there was a new corporation, having new duties, of a totally different nature, and new liabilities.

As against the plaintiffs, Gilman has no equity. His defence is founded on his own breach of trust as a director. If he did not consider himself bound beyond the period named in the original act, it was his duty to call for new bonds. And it is no excuse for him that this duty rested

upon others as well as upon himself. He culpably neglected his duty, and now seeks to derive an advantage from his own neglect. To permit this would be to subvert the first principles of equity.

RICHARDSON, C. J. drew up the opinion of the court.[*]

The original act incorporating this bank declares, that the directors shall have power to appoint a cashier ; but no time is prescribed for his holding the office. He is appointed by the directors, holds his office at their pleasure, and may be removed whenever they see fit to remove him.

The record of the appointment of Rogers fixes no period for his holding the office. It simply states the fact that he is appointed cashier.

The recital in the condition of the bond is simply that Rogers has been appointed by the directors cashier, and the condition is only that he shall faithfully discharge the duties of the office, and account for all money and other property in his keeping.

He continued in office under the appointment mentioned in the condition of the bond, from 1809 until 1830 ; and the plain letter of the condition is that he shall faithfully discharge the duties of the office so long as he shall hold it under that appointment.

Any delinquency on the part of Rogers while he continued in office under that appointment, is within the broad terms of the condition ; and in order to entitle the defendants to judgment in their favor, it is incumbent on them to show us some reasonable ground on which we can hold that the delinquencies which are admitted to exist in this case are not within the true intent and meaning of that condition.

It is contended on the part of the defendants, in the first place, that as the corporation was by its charter limited to

[*] PARKER, J. did not sit.

continue only twenty years from the 1st January, 1804,
when the appointment of Rogers was made, the condition
ought not to be construed to embrace any delinquency which
happened after the expiration of that time ; and as no delin-
quency is found to have happened in this case within the
twenty years, the defendants are not liable on this bond.

But on what ground are we to hold that the condition
was intended to be limited by the time mentioned in the
charter ? The condition itself is silent on that subject. It
is in the most general terms.

Rogers was appointed to hold the office during the pleas-
ure of the directors. It was known to Rogers and his sure-
ties that he was to continue as long as the directors chose to
retain him, and he chose to stay. The condition must be
presumed to have been intended to render them answerable
so long as he should remain. The duration of the office
depended on the will of the directors and of Rogers. They
might remove him at pleasure, and he might resign when
he chose. The charter might be surrendered, or forfeited,
and the office of cashier cease. The duration of the char-
ter might be prolonged by an act of the legislature. All
this must be presumed to have been well understood by the
obligors in this bond. What is the probability that the par-
ties to this bond thought of the time when the charter was
to expire when the bond was executed ? Or if the surety
had thought of it, what is the probability that he would
have considered it of any importance ?

Rogers might continue cashier during a long life, or he
might cease to be cashier in a week. How long he might
continue was wholly uncertain. But the condition of the
bond is in general terms,—broad enough to cover all the
time he might remain in office. There is no limitation in
the terms of the condition. How then can we say that it was
understood that the obligation was to embrace only delin-
quencies happening during the period fixed in the original
act of incorporation ? The appointment has no reference

to that period. The condition contains no allusion to it. Rogers remained cashier after that period, just as he had been before. Mr. Gilman, the surety, was a director at the time the twenty years expired, and he must be presumed not to have supposed that the bond ceased to cover the acts of the cashier,—otherwise he would have called upon Rogers for a new bond.

Indeed we see no solid reason for supposing that the bond was given with any reference to the time mentioned in the charter, any more than that it was given with a reference to the year during which the directors who appointed Rogers were to hold their office. The surety may just as well say, I had confidence in the directors who appointed Rogers, and was willing to be bound as long as their year continued, and no longer, and the bond was given with respect to that year only. The only reason why he is not to be permitted to say this, is that the condition of the bond is not so limited. But it is just as much so limited as it is to the time mentioned in the charter.

The true rules of law to be deduced from all the cases on this subject, are these :

When the term of office is limited to a particular period, as a year, or five years, and the person appointed cannot continue in office for a longer period without a new appointment, then the official bond, if nothing appear to the contrary, is presumed to be intended to be confined to the particular term : and if the officer be re-appointed there must be a new bond.

But when an office is held at the will of those who make the appointment, and is not limited to any certain term, then the bond is presumed to be intended, if nothing appear to the contrary, to cover all the time the person appointed shall continue in office under the appointment.

Thus a sheriff is appointed in this State to hold his office during the term of five years, and cannot hold it beyond that term without a new appointment. The bond he gives

does not therefore extend beyond the term for which he is appointed.

But the deputies of the sheriff hold their offices at the will of the sheriff, and their bonds may extend to any period during which they are continued in office, notwithstanding the sheriff may in the mean time be re-appointed, and be compelled to give new bonds himself.

These rules are founded in sound reason and good sense. The presumption which the law makes as to the intention of the parties to the bond is the natural presumption in both cases.

Now we are of opinion that the terms of the condition in this case are broad enough to embrace the whole term during which Rogers was cashier, and that there is nothing in the form of the appointment, the nature of the office, the words of the condition or the conduct of the parties, that gives the slightest indication of any intention in any party that the bond should be limited to the period mentioned in the original charter as the termination of the corporation.

But it is contended, that the additional act of the legislature made such changes in the corporation that the sureties ought not to be held answerable for the conduct of Rogers after that act took effect.

The most material provision in the additional act was that it prolonged the existence of the corporation for twenty years. But this furnishes no ground for discharging the surety in this case. He having in effect contracted to be answerable for Rogers generally so long as he should remain in office, the prolonged time is as fairly within the scope of his contract as any time that elapsed previously. If he intended to be answerable only for the first twenty years he should have made his contract accordingly. To hold him answerable so long as Rogers continued cashier, is to hold him answerable according to the terms of his contract.

The additional act contains further provisions, that there shall be no division of the capital stock without the consent

of the legislature, nor shall the bank have in circulation bills exceeding in amount the capital stock actually paid in, under a penalty not exceeding $10,000, nor less than $1000. But we see nothing in these provisions that materially varies the condition of the surety, or that affords the slightest pretence for holding him discharged. If the cashier had incurred all the penalties which the additional act prescribes, it would have had no more effect upon this bond than if he had incurred forfeitures to the same amount under any other law. The surety could not have been affected by it. We are therefore of opinion that there must be in this case

*Judgment for the Plaintiffs.*